and this is not a session. I was just in the back of the meeting. Can you please call the first case? 14-2119. Please approach. Good morning, Your Honors. Elena Penick appearing on behalf of Defendant Daryl Evans. Good morning, Your Honor. Claire Wesley Conley on behalf of the people of the state of Illinois. Okay. The microphone is recording. It doesn't project. How long do you wish to argue and reserve for? Fifteen minutes for argument, if possible, and three minutes for rebuttal. Good morning, again. I'd like to address the first two issues from my brief and reserve, as I said, three minutes for rebuttal. One of the defendant's core constitutional rights is the Sixth Amendment right to a public trial, a right that may yield to other considerations in only the rarest of circumstances.  In this case, just one member of the public, a woman who raised Evans' little brother and whom Evans knew as his step-grandmother, showed up in court to observe jury selection at Evans' murder trial, and the judge made her leave before it even began. Evans' attorney explained she had admonished Evans' grandmother not to speak to the veneer, and the judge even acknowledged she hadn't caused any problems so far. Still, the judge made her come back on Monday, saying, We won't have enough room. There's only three rows. We've got to fit a panel of 45 in here. Well, the United States Supreme Court said that's not good enough. In 2010, Presley v. Georgia said, Make room. Put her off to the side. Call fewer prospective jurors. You don't need all 45 in there at once. Instruct the jury pool not to engage with the audience. Try to make it work, because the accused has this right, and the judge can't violate it without showing he or she had a very good reason for doing so, and that every effort had been made to accommodate the public. Were any of these accommodations suggested by Mr. Evans' counsel? No, Your Honor. I mean, she suggested it was only one person and they could make it work, but they didn't get into specifics beyond the, you know, it was a small courtroom. But especially in a case where it is only one person, it's not difficult to conceive of how, as I said, calling fewer prospective jurors, putting them off to the side, putting a bailiff nearby. What's significant here is the case law says it's the judge's job to make a record that other accommodations were not feasible. And so that's exactly what happened in Presley v. Georgia. The family relationship in that case wasn't significant to the court's analysis, but it just so happened that that case involved the defendant's uncle, who was hoping to attend voir dire. And as in this case, the judge didn't understand his role in protecting the defendant's right to a public trial, saying there just isn't enough space. And so again, Presley said it's the judge's job to consider those alternatives to closure and also that the judge needs to articulate specific concerns warranting a closure, not just this generic idea of, like, well, what if they start talking? Because if that were enough, closure would be permissible in nearly every case and the public trial right would be meaningless. So under nearly identical facts to those at voir, the U.S. Supreme Court reversed and remanded for a new trial. But here, did the judge even consider any alternatives before she asked the grandmother to leave? Because it was just a very couple of comments and then, of course, I'm going to ask you to leave and come back on Monday before any kind of consideration. No, there was no consideration at all. In fact, it's in that way similar to the Taylor case from the second district where, you know, in that case the judge overtly had a blanket policy of excluding family members. That seems to be what was going on here since there had been no actual problems. But we don't have any indication of that in the record, unlike Taylor, right? No, we do not. We do not. But if you take what the judge said and think about it, it would mean that any time that judge has a jury to be selected, it would have the same problem. Absolutely. Yeah, there was nothing special about Evan's grandmother, as far as we know, that made her a problem in this case. Was there another spectator that came in, a defendant, a case that she recognized, that the judge recognized during jury selection? After the trial, there was a mention that someone had come into the courtroom during jury selection and the trial explained that that person was a former defendant who had fell not guilty by the judge and she asked him to leave. Yes, there was some comment about that on the record as well. How does that fit in with your argument? Well, we only raise it in terms of this particular spectator trying to attend. But, yeah, there was some discussion also about something that had occurred with another spectator. But we can't understand why the judge acted in this fashion, given the size of those courtrooms. Well, respectfully, Your Honor, I think even if the courtroom was half the size, if you have 35 prospective jurors, that's really going too far. There's a right here that needs to be protected. We only have one person trying to attend. So there's a lot of accommodations that have been proposed in the case law about how you need to make it work. And, in fact, in this case, I think only 28 of those prospective jurors were questioned. So you can see how it wasn't necessary to put all those people in there at once. And, in fact, Evans himself wasn't in the courtroom. So a little extra space there. So in addition to Presley and Taylor, you know, there's another case, People v. Willis, where a similar situation, the judge didn't understand the right of the accused to have a public trial. And, again, it was voir dire and family members. And this court found that accommodations hadn't been considered appropriately and that a new trial was warranted as a result. And as those cases indicate, denying a defendant's right to a public trial is one of those rare and special errors that the court has considered structural, meaning it's a systemic error that serves to erode the integrity of the judicial process. And so the defendant doesn't have to show prejudice, specific prejudice arising from that error. So because Evans' right to a public trial was violated in this case, his conviction should be reversed in the matter of mandate for a new trial. The prosecution says that we would have to speculate whether there was an alternative. Do you agree with that? Well, what's critical about the case law is it says that the judge has an affirmative duty to make a record about what's possible and what's not. And so it indicates that it's willing to indulge in that kind of speculation in order to protect this right. So, yeah, some speculation may be involved, but it's not difficult to see how in an average courtroom or even one of those small ones, there are accommodations that are possible here. Turning to the second issue from our brief, Evans is also entitled to a new trial because the prosecutor engaged in misconduct by vouching for the credibility of co-defendant Jamar Jackson, giving rise to a due process violation. In this case, the prosecutor told the jury that he and his partner in the state of Illinois have choices to make in prosecutions, including weighing people's culpability and evaluating whether or not there's someone we believe should be considered as a witness and that making Jackson a witness in this case was the right decision. This court's recent decision in Williams found reversible error under very similar circumstances. In that case, the prosecutor argued in closing, when a gang member comes before us and is charged with an offense, we don't just take everything he says for truth, we check it out. We don't just take the word of anyone. And the Williams court held that those remarks backed the witness's testimony with the credibility of the government, which is universally improper, and that in a closely balanced case where credibility was central to the outcome, the error required a new trial. Okay, tell me how this case is closely balanced when you have Petty and Williams' eyewitnesses identifying Evans. Well, Petty and Williams' identifications were suspect for a variety of reasons. The incident happened at a gas station late at night. It was a fleeting, unexpected kind of occurrence, so their opportunity to view the offenders was limited, and Williams admitted he had been drinking. Neither Williams nor Petty claimed to recognize the offenders involved, so although they eventually made a stranger identification of Evans, that wasn't until one month and two months after the fact, you know, after Torian Brown volunteered some information in the hopes of getting a deal for himself. It's also worth noting Williams had three felony convictions to his name, and, you know, both he and Petty were longtime friends of Phipps, so there could be some bias at play. You know, the state brought out Arnetta Jameson, who's a great witness in the sense that she's forthcoming and disinterested, but she never identified Evans, so. Well, she identified his car and that his co-defendant was driving the BMW, so somebody else was driving Evans' car. Well, yeah, I mean, but she didn't identify him, and, of course, cars can be used by other people as well. And similarly, you know, there was some physical evidence as far as the type of weapon involved and phone records, but that only showed, it corroborated what kind of weapon was used but not by whom, and, you know, we don't know that Evans' phone was being used by himself. So there's a lot of little pieces to the state's case, but if, you know, you start picking at all of them, you realize it doesn't add up to that much, particularly when you have this co-defendant with, who's getting this fantastic deal and the state is vouching for him, so. And specifically tell me what language you think the state's attorney used to vouch for Mr. Jackson's credibility. Well, first of all, they say it was the right decision, and they say, you know, they've weighed his culpability, basically, and in saying that, they're saying they believe his story. It wasn't the state criticized, though? I mean, in the defendant's closing argument about the deal they gave Jackson? Well, they can revive his credibility in other ways, but not by saying we vetted him, basically, and that. But they didn't say that. They said, we made a decision, and we turned him into a witness, which they did, obviously. How does that vouch for his credibility? I mean, right after that, didn't the state's attorney quote the instruction on it's for you to decide a witness's credibility? Well, I don't think they needed to talk about their own decision-making process. That's not really relevant to his credibility. The question is what his motives were in testifying one way or another, not whether or not they made the right decision in putting him on in the first place. Are we to ignore the jury instructions and feel that the jury wasn't going to follow them? I mean, because the jury instructions said it's for you to make that decision on that believability. Right. Well, the remarks in question weren't identified as improper, and so, you know, again, like Williams, they can still have an impact in a case where credibility is significant. They could, but pure speculation, critically considering when it occurred and the timing. I'm sorry, Your Honor? Considering the timing and the fact that it was in passing. I mean, it wasn't dealt with for a long period of time. Well, I think, again, one of the things you hear if you read the state's remarks are, we, we, we, you know, and it has that same feel of the Williams case as far as the prosecutors putting themselves out there,  They get that kind of collegial feeling sometimes in argument that, like, we're all on this team together, and there's limits to that kind of argument, and I think they crossed a line here. So because the prosecutors' improper remarks about Jackson's credibility could have unfairly tipped the scales against Evans, a new trial is required in this case. Thank you. May it please the Court, Counsel. The trial court in this case exercised appropriate discretion in asking Ms. Peterson to leave the courtroom only during jury selection. The trial court in this case expressed the dual concern of jury contamination and having enough room in the spectator section to accommodate all of the potential jurors. Well, did the trial judge do that initially? Yes. Did she say that initially, that I'm concerned about jury contamination? Because didn't she say, She, yes, sir, behaved appropriately, no problem. Right. She said, she said, I'm going to have to ask you to leave, and then went on and explained her concern about jury contamination in this case, and then also went on later on and explained that due to the small confines of the jury room. She made a record in this case. She didn't say it in the very beginning, but she did say it and made a finding in this case expressing her dual concern for jury contamination, which is a facially valid reason to limit or close a trial. And wouldn't that apply in every jury trial in this particular courtroom? I mean, I can't conceive of a situation where this trial judge would have a jury where a member of the public could attend. The difference in this case, there is that concern. And I'm sure judges always have concern about jury contamination. And the judge in this case went beyond that. She expressed her concern about the jury contamination, and she also expressed she made a record as far as what she was dealing with when Ms. Peterson walked in. She had already called 45 jurors down for jury selection. She had three rows of, I call them pews, but seating for the jury to do, and she was worried about whether it's seating Ms. Peterson right next to all of the jurors in this case. Why would it, again, occur every time in that courtroom a judge called down a veneer of 45? You'd always have that problem, right? Yes, but in this case, what the judge did in this case is she made an appropriate record. There's four factors that the judge needed to consider in making her decision. Where does she consider alternatives? Where does she consider alternatives? Defense counsel said, I've already admonished her, and the judge found that that would not be adequate under the circumstances because of the small confines of the jury room. So, again, every time there's a trial and you call down 45 in that courtroom, you can't have room for a member of the public. If the judge makes an appropriate record in this case. And in the case, she did so in this case. The record is one thing. The question is the alternatives. Right. The Supreme Court of the United States said, you've got to look at alternatives. Right. Very important. Right. Why couldn't she call 30? Why couldn't she call 32? We don't know that that was a viable option at this point. Yes, we do. We know you can call less than 45. Is there a rule that says you only can call 45? The judge at that point, when the woman was there, had already called 45 jurors down. She could change her mind. Is that right? There is no evidence in this record that the judge could have called down less jurors. If that was an option, defense counsel could have suggested that as an option, but did not do so. The judge's obligation in this case was to consider reasonable alternatives. She did so. Where does she consider it? One reasonable alternative would be to have less people. Where should she consider it? That was not suggested to the judge. There's no evidence in the record that that was a reasonable alternative at this point in the proceedings.  And she said that that was not an appropriate remedy to this situation because, again, of the small confines of the spectator section in this jury room. But you've got a defendant who's absent because he can't control himself in the courtroom. Obviously, the defendant would have had the right to be present. Right. Where would the defendant have been sitting? Why couldn't his step-grandmother sit there? Well, it's one of those things that, you know, you could come up with scenarios as to where she could have sat. But the point is, is the judge did, before she exercised her discretion, that she considered reasonable alternatives. There's no suggestion that she has to consider every possible scenario that someone else could come up with. And that was not even, like, Chris sitting where the defendant, are you suggesting she could have sat where the defendant was sitting? I don't know whether or not the sheriff would allow something like that. I don't know. That's all speculation on this part. And, again, I think there's an obligation, not only on the part of the judge, but also of defense counsel in this case, to make a record. And that's what happened. Like, when they cited to Taylor and Willis and Presley, there's evidence in the record that shows that there were concrete, reasonable alternatives for the judges in those cases. For instance, in Presley and in Willis, there was evidence in the record that, when the judge was concerned about mixing up the jurors in those cases, that the jurors could have sat on one side and the family members could have sat on another side. There was concrete evidence in the record to support a reasonable alternative. There is no evidence in this case of a concrete, reasonable alternative. Yes, there is. That is not calling 45. Having called 45 and then seen somebody in the courtroom, we have a constitutional right at stake. I mean, that is more important. The constitutional rights mean something in this country. Correct. And you're saying that it's more important to have 45 individuals sitting there than to have one person who is related to the defendant in court. You're saying that that trumps the Constitution. Is that right? I'm saying that there is a balancing. The defendant does not have an absolute right to a public trial. And it must be balanced in this case. And in this case, the judge said, I have 45 people coming down here at this time. There's no evidence that she could have made a phone call to say, call less people down. That's speculation as to whether or not those... It's not speculation because they haven't come into the courtroom yet, right? That's correct. So at any time, she could have instructed the sheriff to bring down less people who only let a certain number of people in. I don't know that that's an option at that point. Of course it's an option at that point. That's just common sense. Just common sense. So, I mean, we have to balance. Right. And we have to follow what the United States Supreme Court has said in these circumstances. Right. And under your reasoning, that courtroom, maybe we should just order that that courtroom not be used for criminal trials when you're going to call 45 members of the veneer because it can't be used because you can't get members of the public in there. No, what I... We're prohibiting the person's constitutional rights by having a courtroom that's constructed in order to avoid allowing the public in at a certain point during the trial. No, what I'm saying is that in this instance, the judge had this dual concern, and she made an appropriate record in this case expressing her dual concern about the potential for jury contamination and the small confines of the jury room in this case. How could we contaminate... If a woman has been instructed by a defense counsel, he hasn't disrupted anything, there's no evidence that she was disrupted, that you wouldn't consider those instructions by the judge to whatever they might be. What's an alternative? I respectfully disagree as to whether or not that's a viable... that there's evidence in this record that that is a viable alternative in this case. Defense counsel never suggested that this was a viable alternative in this case. And in this case, what the judge... Well, he did because he said that I've instructed her and told her what her responsibilities are, and she's going to follow that. So there is evidence in the record. I'm sorry, I misunderstood. There is evidence that he admonished her, that defense counsel had admonished her, and the judge in this case exercised her discretion, which she's permitted to do, and said that she was concerned that that would not be enough under the circumstances in this case to make sure that there was no possibility of jury contamination. What's different about this case than any other case? There isn't. So then every time... No. No, the difference in this case is the judge did everything that she was supposed to do. There's four things the judge needs to do. She needs to present a facially valid reason. She must consider reasonable alternatives. She must... The closure in this case was no broader than necessary because it was only during jury selection, and the judge made adequate findings. She presented an adequate record in this case to support the closure of the trial during jury selection, and only during jury selection. She welcomed the woman back after jury selection. There is evidence in the record that the woman came back for closing arguments. So she... You know, it was only during jury selection that the judge did this when there was this dual concern. She did not close the trial for the entire portion of the proceeding. Counsel, the Illinois Supreme Court has said that a defendant has an absolute right to a public trial, and they found it to be a structural error. So we're trying to make a decision in this case. How do we ignore the Supreme Court's holding in town? Well, I think that there's... I suspect they disagree that there's an absolute right to a public trial. There is a... He has a right to a public trial, but it must be balanced if there is another overriding interest in this case. They said it's a structural error. It's correct. It's a structural error. It's a systemic error. Yeah, exactly. They say it's very, very important, and you're asking us to ignore it because the judge made some findings. No, I'm not asking you to ignore what I'm asking you to do in this case. When you talk about structural error, that just means the defendant doesn't have to establish a prejudice prong in this case. Okay, and it means it's systemic and very serious and very important. I appreciate the seriousness of this matter, but the problem is in this case is that the judge exercised her discretion in balancing what she found would be a problem, a potential problem during jury selection, and she had to balance that versus the defendant's right to a public trial, and she exercised her discretion in limiting it only for jury selection. But you know what our concern is? There are several courtrooms at 26th Street that are that size. Yes. And it will be difficult to accommodate people when they have jury trials. Correct. So in all the cases where they have a jury trial during 4-D, they're going to exclude the public? Is that what's going on? No, and I'm not asking this court to say that. What I'm asking this court to find is that the judge in this case made an adequate record supporting her decision in this case, and there's four factors that she has to look at, and those four factors were satisfied in this case. I don't think if you uphold this case that you're going to give carte blanche to judges excluding people during jury selection and having a blanket policy. But aren't you suggesting... She didn't say there was a blanket policy. Are you suggesting to us that if the court makes a finding in future cases and they set forth those four factors, then we should say that it was okay to exclude the public during 4-D? Yes, if they present facially valid reasons, which in this case was the jury contamination, they consider reasonable alternatives, if they satisfy the four factors, yes, I'm saying... But there were some accommodations that could have been made. Don't you agree? I know. You suggested that she could have called the jurors in a staggered fashion. Couldn't she have accommodated the defendant in that fashion? I don't know if that was available. I really don't, because it's one of those things where, you know, you have 45 people coming down. If you want to leave some people out in the hallway, some of the jurors out in the hallway, and then you have problems with making sure that those people are not being contaminated by what's going on in the hallway, that's... And then call them down. The sheriff goes up and gets the jurors, and they bring them down. They bring them down in a staggered fashion. Wasn't that possible? I do not know from this record that that was a possibility. And that's what we have to look at, is the record that's before us. And, you know, the defense counsel never presented any evidence suggesting that that was a possibility in this case. You can proceed. Thank you. And turning to the next issue, the prosecutor's comments in this case was well within the bounds of appropriate comments during closing arguments. A prosecutor never stated in this case that the state's attorney's office had made a credibility determination regarding Jamar Jackson. In fact, he clearly told the jury that it was their responsibility to determine the credibility of Jackson. Quote, but ultimately you will decide. You must weigh the testimony of Jamar Jackson and find out if you believe he is credible. And there is an instruction that you will receive that says, essentially, when a code offender testifies, you need to look at it with caution, and we welcome you to give it that kind of scrutiny. The prosecutor, instead, was just merely rebutting defense counsel's arguments during opening statements that questioned the sweetheart deal that Jackson had struck with the state. Defense counsel said, Jamar Jackson has struck a deal with the state and is going to get a great reduced sentence. He's not going to have to do murder time, even though, according to the state, he was there and took the car after the young man was shot. And the prosecutor, in responding to that statement, said, no guessing about fantasy deals that we made with witnesses or speculating about what might have been said here or there. If there is a deal with someone like there was in this case with Jamar Jackson, you hear about it. There was no comments in this case that we had made a credibility determination regarding Jamar Jackson. Ultimately, what he was discussing was the relative culpability of Jamar Jackson versus the defendant and why Jamar Jackson was a witness in this case. And even if this court were to define that this isolated comment was improper, the error in this case would not result in a finding that the defendant was prejudiced to the extent that a new trial was merited. The evidence in this case was overwhelming. Jamar Jackson's account of the shooting was corroborated by Duane Petty, by Spencer Williams, and by Arnetta Jamison, and along with the phone records. Spencer Williams ID'd the defendant in a photo array and again at trial. Duane Petty identified the defendant in a photo array and a lineup and in trial as the shooter in this case. Arnetta Jamison identified Jamar Jackson. Both of them, there's overwhelming evidence that both of those gentlemen were involved in this offense. The defendant also admitted his involvement in the shooting to Torian Brown a few days after the shooting and the defendant also corroborates it by the fact that the defendant chose to paint his gray car black afterwards. Not only was there overwhelming evidence in this case, there was, the jury was instructed that closing arguments are not evidence and to disregard arguments not based upon the evidence. And again, that this comment in this case was isolated. As far as the decision in People v. Williams, the evidence in that case, what this court found was closely balanced. And again, the evidence in this case was overwhelming for the defendant's guilt in this case. And in Williams, the prosecutor said, when a gang member comes before us and is charged with an offense, we don't just take everything he says for truth immediately. We check it out. So in that case, the prosecutor was clearly talking about that they had made a credibility determination regarding the witness in that case. In this case, the prosecutors clearly responded to defense counsel's argument and was referring to his relative culpability and why he was a witness in this case. At this point, we'd ask that this court affirm the defendant's conviction and sentence in this case. Thank you. Thank you. Just a couple quick points about that first issue, Your Honor. Counsel hit the nail on the head when she said, you know, this court can come up with scenarios as to where Evan's grandmother could have sat, but, you know, well, that's exactly the point these cases are making. The reviewing courts are permitted to come up with scenarios that are reasonable under a common-sense view of how courtrooms work and jury selection works. And the fact that you can come up with those scenarios means that there wasn't enough of a record in this case to justify excluding his grandmother. Also, counsel mentioned that the judge welcomed her back later, but that's really... that doesn't solve the error that occurred in this case. In all of the cases we've relied on, the error has stemmed from the exclusion from voir dire only. So the fact that she was welcomed to come back later didn't correct the error in any fashion. So for these reasons, we would ask for a remand for new trial. Thank you. Thank you very much. Thank both sides for excellent presentations and briefs. We'll take the case under advisement, and we're adjourned until we call the next case. Thank you.